OPINION
Defendant-Appellant Andre Sinkfield appeals his convictions on three counts of aggravated robbery, one count of attempt to commit aggravated murder, one count of aggravated murder, and one count of having a weapon under disability. In addition, all but the last count carried firearms specifications. Sinkfield presents eight assignments of error, claiming first that the judgment is against the manifest weight of the evidence. Sinkfield's second, third, and fourth assignments claim error where the trial court refused to permit a defense witness to testify, restricted the scope of an expert witness' testimony, and permitted the State to present hearsay testimony, respectively. Fifth, Sinkfield contends the trial court's response to a question posed by the jury during deliberations was error. In his sixth and seventh assignments of error, Sinkfield first argues the trial court erred in permitting the State to exercise peremptory challenges against two African-American veniremen, then attacks the propriety of peremptory challenges generally. Finally, Sinkfield claims the cumulative effect of prosecutorial misconduct compromised the fairness of his trial.
The night of February 3, 1996, Billy Vance and his friend, James Brown, were at Vance's home at 952 Iola Street in Dayton. At about 11:15 p.m., they were joined by two more of Vance's friends, Brenden Byrdsong and Jay Washington. Vance, Byrdsong, and Washington smoked some marijuana, and the four men watched basketball on television. Not long after Byrdsong and Washington arrived, Vance's telephone rang and Washington answered and had a short conversation, then hung up the phone. About five minutes later, there was a knock at the door. Vance hollered, "Come in," and Washington went to open the door. Before he could do so, however, two men entered the house. Vance recognized one of them and said, "What's up, Turtle Man?" As he and his companion drew guns, "Turtle," later identified as Jeffrey Stevens, replied, "You know what's up. This is a robbery," and ordered Vance and his guests to lie down on the floor. Vance tossed his wallet down then complied with Stevens' demand, as did Brown and Byrdsong, but Washington sat on a loveseat instead. After Stevens went into Vance's bedroom and returned, he and his accomplice put pillows over Vance's and Byrdsong's heads. Stevens pushed his gun against the pillow covering Vance's head and pulled the trigger, but nothing happened. He exchanged guns with his accomplice and fired a bullet through the pillow and into Vance's head. Within minutes, Vance died.
After Vance was shot, Brown decided he was not going to be next, so he jumped up and rushed the assailants, pushing them into another room. Seeing his chance to escape, Byrdsong fled outside then ran next door where Vance's brother, James Townsend, lived. Meanwhile, Brown managed to run for the door of Vance's house, but was shot in the back by one of the gunmen, who then ran from the house. Although less than conclusive, the evidence suggests that Washington fled with the assailants.
After Byrdsong frantically told Townsend of the trouble at Vance's house, Townsend ran next door where he found Brown in pain on the front porch. Townsend proceeded into the house and discovered his brother dying on the floor. He questioned Vance about who had shot him and Vance tried to respond, but Townsend could not understand what he said. Townsend went back out to the porch where Brown told him "Keith DeWitt's boys" were responsible and that Turtle had shot him. Upon hearing the name "Turtle" from Brown, Townsend realized that was what Vance had been trying to say before he died. Paramedics and police arrived on the scene and transported Brown to the hospital. He later learned that the bullet had severed his spine, leaving him permanently paralyzed.
Initially, Keith DeWitt was arrested for the robberies, the attempted murder of Brown, and the murder of Billy Vance. Within a few days of the shooting, however, Brown viewed several photo spreads prepared by the police and identified Stevens and Sinkfield as the assailants. DeWitt was released and Stevens and Sinkfield were eventually arrested.
Sinkfield was tried and convicted on three counts of aggravated robbery, one count of attempted aggravated murder, one count of aggravated murder, and one count of having a weapon under disability. His convictions were overturned on appeal in State v.Sinkfield (Oct. 2, 1998), Montgomery App. No. 16277, unreported. A second trial was had, and Sinkfield was again convicted on the same six counts noted above. He was sentenced to ten to twenty years of imprisonment on each of the aggravated robbery counts and on the attempted aggravated murder count, life imprisonment on the aggravated murder count, and three to five years imprisonment on the having a weapon while under disability count, all to be served consecutively. This appeal followed. Sinkfield asserts eight assignments of error, but we address only his second, third, and fourth. We find the second assignment dispositive, but discuss and overrule his third and fourth assignments anyway, inasmuch as the issues raised therein are likely to recur during retrial. The remaining assignments of error are rendered moot by our disposition of the second.
 I.
The trial court erred in denying Defendant-Appellant the right to call a witness to testify as to crucial evidence in violation of the Defendant-Appellant's rights under the Ohio and United States Constitutions to compulsory process and to due process of law.
In his second assignment of error, Sinkfield claims that the trial court's exclusion of Carleya Gray's proffered testimony violated his right to compulsory process as guaranteed by theSixth Amendment to the United States Constitution. Sinkfield also claims although Gray's testimony was admissible under the hearsay rules, his right to compulsory process would trump the Rules of Evidence so that even if Gray's testimony is deemed inadmissible hearsay evidence, it may still be offered into evidence by an accused. We find Sinkfield's argument pertaining to the admissibility of Gray's testimony under the hearsay rules persuasive, however, and thus have no reason to address the compulsory process issue.
In his case in chief, Sinkfield called Rod Garrett who testified that shortly after Vance's murder, he received a telephone call from Stevens during which Stevens confessed to having just killed Vance with Henry Watson.[1] Upon the State's cross examination, Garrett acknowledged that the written statement he gave to police in March of 1996 included no mention of his phone conversation with Stevens, and that he had amended his statement six days before Sinkfield's February, 1999, trial to include an account of the phone call and Stevens' confession. Later, defense counsel requested that the court permit Garrett's girlfriend, Carleya Gray, to testify, and proffered her testimony. Gray would have testified that she was with Garrett when he was on the phone with Stevens, and that immediately after hanging up the phone, he turned to her and said she would never believe what just happened, and that Stevens had confessed to killing Vance with Henry Watson. The trial court denied Sinkfield's request to present Gray's testimony.
In their briefs, both Sinkfield and the State seem to concede that Gray's proffered testimony was hearsay, and argue whether it should have been admitted into evidence under an exception to the hearsay rule, in particular, those permitting a witness to testify to a declarant's present sense impression or excited utterance. See Evid.R. 803(1) and (2). We find, however, that Gray's proffered testimony is not hearsay at all. Evid.R. 801(D)(1)(b) specifically excludes from the definition of hearsay a witness' testimony as to a declarant's statement that is "consistent with [the declarant's] testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." As noted, Garrett testified at Sinkfield's trial. The State's cross examination of Garrett was directed primarily toward circumstances that suggest Garrett had recently fabricated the part of his testimony relating to the phone conversation with Stevens shortly after Vance's murder. Therefore, the trial court should have given Sinkfield a chance to rebut the State's charge of recent fabrication by allowing Gray's testimony. Its failure to do so constituted an abuse of discretion.
Next, we must determine whether the court's error was so prejudicial to Sinkfield's defense that reversal of his convictions is required. In doing so, it bears repeating that the credibility of witnesses is primarily for the trier of fact to determine. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The nature of Garrett's testimony was such that, if believed, it would have completely exonerated Sinkfield of all charges. The State's position in cross examining Garrett was that the portion of his testimony most helpful to the defense, specifically that Stevens had confessed his and Henry Watson's involvement in Vance's murder, was fabricated just prior to Sinkfield's trial. Had she testified, Gray would have recounted that Garrett told her the substance of his conversation with Stevens immediately upon hanging up the phone, which, if believed, would have rebutted the State's charge of recent fabrication. By not allowing Gray to testify, however, the trial court deprived the jury of the opportunity to reevaluate Garrett's credibility in light of Gray's testimony after the State cast doubt on his truthfulness during its cross examination. We cannot say that this error was harmless, especially because of the exonerative nature of Garrett's testimony. Because we find the trial court committed prejudicial error by not allowing Gray to testify as is permitted by Evid.R. 801(D)(1)(b), we need not address the compulsory process issue also raised by Sinkfield in this assignment of error.
Sinkfield's second assignment of error is accordingly sustained.
 II.
The trial court erred in unreasonably restricting the direct testimony of Defendant-Appellant's expert witness in violation of his rights to compulsory process and due process of law under the Ohio and United States Constitutions.
 In his third assignment of error, Sinkfield claims the trial court erred in sustaining the State's objections to two questions put to Sinkfield's expert witness, Dr. Solomon Fulero. The Ohio Supreme Court has held that expert testimony concerning "the variables or factors that may impair the accuracy of a typical eyewitness identification is admissible under Evid.R. 702." State v. Buell (1986), 22 Ohio St.3d 124, paragraph one of the syllabus. Expert testimony regarding the credibility of an identification by a particular eyewitness, however, is inadmissible except in certain situations not present in the case before us. Id. at paragraph two of the syllabus.
Dr. Fulero testified to the three stages of memory; acquisition, rentention, and retrieval, and the general unreliability of eye witness identifications. In the course of his direct testimony, Sinkfield's defense counsel asked the following questions: (1) "If a person knows that they're supposed to identify one person when they go into a setting where there is only one person, is that a problem?"; and (2) "[I]s a photo spread also fairer [sic] than just bringing in a person into the courtroom to make an identification without having done a photo spread first?" Tr. at 614 and 649. The State's unembellished objections to both questions were sustained by the trial court. Sinkfield now claims these "were very important questions necessary to properly impeach the validity of Byrdsong's in court identification." Appellant's Brief at 21. Furthermore, Sinkfield argues that the trial court's error in sustaining the State's objections is cause for reversal of his convictions. The State contends Sinkfield's questions were so specifically tailored to the circumstances of Byrdsong's identification of him as a participant in Vance's murder that they went beyond the scope of expert witness testimony allowable under Buell.
We find, however, that the State's objections were sustainable as to the form of the questions asked rather than the testimony they sought to elicit from Dr. Fulero. Taking the second question first, we observe that Buell does not leave room for an expert witness to testify as to which of various methods of identification is "fairer." While defense counsel's phraseology may have been merely unfortunate, the question nevertheless asked Dr. Fulero to testify as to which of two identification procedures was more fair than the other. That we know of, fairness is not susceptible to the scientific method of testing and instead generally correlates to one's perspective, making it a subjective assessment. The State's objection was sustainable on that basis. Though defense counsel could have rephrased the question in a way that would have allowed Dr. Fulero to testify as to the factors and variables that may reduce the reliability of one-on-one identifications, the issue was not pursued after the State's objection was sustained.
The problem with the first question is more subtle. Defense counsel predicated his question on the fact that an eyewitness knows he is "supposed to identify one person" when performing an in-court identification. As used in defense counsel's question, the word "supposed" is defined as "required by or as if by authority." Merriam Webster's Collegiate Dictionary, Tenth Edition (1997) 1184. The State's objection might well have been to the suggestion of coercion implicit in defense counsel's choice of words, and it was sustainable on that basis. Moreover, after the State's objection was sustained, defense counsel asked Dr. Fulero what the ideal setting was for making a proper identification of a person. Although the question may have been calculated to elicit Dr. Fulero's opinion as to which identification technique (e.g., line-up, show-up, photo spread, in court, etc.) is associated with the greatest accuracy, his answer related to the factors and variables present at the time of thealleged criminal act that would tend to make the eyewitness' identification more reliable. Rather than redirect Dr. Fulero's attention to the identification process itself, defense counsel proceeded to question him about post-event circumstances that might substantively affect a witness' memory. Thus, we find no error in the trial court's decision to sustain the State's objection to defense counsel's question as worded.
Accordingly, Sinkfield's third assignment of error is overruled.
 III.
The trial court erred to the prejudice of the Defendant-Appellant in allowing inadmissible hearsay evidence to be used against him in violation of his rights under the Ohio and United States Constitutions to confrontation of the witnesses against him and due process of law and contrary to the Ohio Rules of Evidence.
 In his fourth assignment of error, Sinkfield argues that certain testimony given by the State's rebuttal witness should have been excluded as inadmissible hearsay, and that the testimony violated his right to confront that witness against him as guaranteed by the Ohio and United States Constitutions. As noted above, in his case in chief Sinkfield presented the testimony of Rod Garrett, who stated that he had had a telephone conversation with Stevens very soon after Vance's murder. Garrett testified that Stevens told him Henry Watson was his accomplice in the crimes at Vance's home. In its rebuttal, the State called Detective Doyle Burke who testified that Garrett's initial statement to the police, made on March 12, 1996, did not include any mention of a telephone conversation with Stevens. On February 16, 1999, however, Burke interviewed Garrett again, and Garrett added an account of the phone call with Stevens to his statement. On rebuttal, the State elicited the following testimony from Detective Burke:
 And let me ask you, did you have a conversation with [co-]defendant Stevens about the Billy Vance homicide?
Yes, I did.
* * * Did you have occasion to re-interview one Rod Garrett?
Yes, I had, prior to the interview with Mr. Stevens.
 And you interviewed Rod Garrett, and at the time you interviewed him, did you already have a written statement from him that was taken back in March of 1996?
A Yes.
 And did you go with that document when you went to interview Mr. Garrett?
Yes, I did.
 And when you interviewed Mr. Garrett, did he add to that particular document?
Yes, he did.
When was that in time?
 Approximately a week prior to interviewing Mr. Stevens, which was on the 22nd of this month [February, 1999].
 So with that information, you went ahead and interviewed Mr. Stevens. Is that correct? The other defendant.
Yes.
 And did you specifically ask defendant Stevens if, in fact, he had made the alleged statement to Rod Garrett that Garrett now writes in his new statement?
Yes, I did.
 And did you advise Mr. Stevens that Garrett said he confessed to him that he did it? Stevens?
Yes.
And did Stevens admit or deny that?
He denied that.
 Did Stevens tell you how many people were involved in the Billy Vance homicide and the other crimes committed on February 3rd [of 1996]?
Yes, he did.
How many?
Two.
 * * * Did he tell you who was involved with those homicides or this homicide?
Yes.
 And at any time when he told you that, did he tell you that Henry Watson was involved?
No, he stated Henry Watson was not.
Tr. at 1000-02. Sinkfield claims Stevens' statement to Burke denying Watson's involvement in the crimes necessarily implicated Sinkfield, since Watson and Sinkfield were the only two people suggested to have been Stevens' accomplice in the murder. Therefore, Burke's testimony as to what Stevens had told him deprived Sinkfield of his right to confront a witness against him, to wit, Stevens.
Initially, we consider whether Stevens' statements were properly admitted into evidence. There is no dispute that the statements meet the definition of hearsay as they were made out of court and offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). To be admissible, therefore, they must fall within one of the numerous exceptions to the rules excluding hearsay evidence. None of the exceptions under Evid.R. 803 apply to Stevens' statements. In our view, the only possible exception that may apply to Stevens' statements is set forth in Evid.R. 804(B), which provides as follows:
 The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
* * *
 Statement against interest. A statement that * * * at the time of its making so far * * * tended to subject the declarant to civil or criminal liability, * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement.
We observe that "[a] decision whether to admit the hearsay statement of an unavailable declarant pursuant to Evid.R. 804(B)(3) is one within the discretion of the trial court." Statev. Sumlin (1994), 69 Ohio St.3d 105, syllabus.
The State and Sinkfield agree that Stevens was unavailable due to his refusal to testify and his insistence that if ordered to do so, he would invoke his Fifth Amendment right to remain silent. Thus, we must determine whether Stevens' statement was against his penal or pecuniary interest and whether corroborating circumstances clearly indicated its truthworthiness.
In his conversation with Detective Burke, Stevens denied having confessed his involvement in Vance's murder to Garrett. In addition, Stevens stated that the crimes that occurred at Vance's home were committed by two people. Although Detective Burke testified that Stevens told him who the two people involved were, Burke did not mention their names during his testimony. Finally, Stevens told Burke that Henry Watson was not one of the assailants at Vance's house.
At the time of Stevens' statements, he had been convicted and sentenced for Vance's murder and the robberies. In none of the statements did Stevens admit to any additional criminal acts which could expose him to civil or criminal liability. Stevens' denials that he confessed to Garrett and named Henry Watson as one of the perpetrators are not statements that would subject him to civil or criminal liability. Therefore, they are not statements against interest under Evid.R. 804(B)(3), and should not have been admitted into evidence at Sinkfield's trial. Furthermore, we do not find Stevens' remaining statements to be clearly against his penal interest because they are, at best, only inculpatory when mixed with considerable speculation, and because Stevens had already been tried and convicted of the crimes about which he was speaking. See State v. Branham (1995), 104 Ohio App.3d 355, 358
(stating declarant's statements that she murdered her husband, made after she was charged but not yet convicted of his murder, "certainly tended to expose her to criminal liability"); State v.Stapleton (Aug. 31, 1998), Perry App. No. 97-CA-62, unreported (finding that declarant's statement, made after his guilty plea, did not contain any admissions to any additional criminal acts which could expose him to criminal liability, and was consequently not against his interest).
Because we find Stevens' statements did not tend to subject him to civil or criminal liability, we need not consider whether corroborating circumstances clearly indicated the trustworthiness of the statement as required by Evid.R. 804(B)(3). We conclude that the trial court abused its discretion in admitting Stevens' hearsay statements into evidence.
Our finding, however, does not end the inquiry, for in addition to the error, Sinkfield must show prejudice to his defense. Where an error in the admission of evidence is constitutional in nature, the error is "harmless beyond a reasonable doubt when the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." State v.Williams (1983), 6 Ohio St.3d 281, paragraph six of the syllabus. Because we find below that Sinkfield's right to confront the witnesses against him was not violated by the admission of Stevens' statements, however, we need only determine whether it is reasonably probable that the exclusion of Stevens' statements would have affected the result in this case. In re Carter (1997),123 Ohio App.3d 532, 542, citing State v. Sibert (1994), 98 Ohio App.3d 412,429. On this record, we cannot say that is the case. Without Stevens' statements, the State's case would have consisted of two eye-witness accounts of the crimes committed at Vance's home, both of whom unequivocally identified Sinkfield as Stevens' accomplice. We cannot say that but for the admission into evidence of Stevens' statements concerning Henry Watson's lack of involvement in the crimes, the outcome of Sinkfield's trial would have been different. This is especially true since Henry Watson himself was called by the defense and testified that he was not involved in Vance's murder or the robberies. Thus, although the better practice would be to exclude the testimony because it was inadmissible, the trial court's failure to do so was harmless error.
Next, we consider whether the erroneous admission of Stevens' hearsay statements violated Sinkfield's right to confront the witnesses against him. Preliminarily, we observe that the Ohio Supreme Court has held that Section 10, Article I of the Ohio Constitution[2] "provides no greater right of confrontation than the Sixth Amendment [to the United States Constitution]."[3]State v. Self (1990), 56 Ohio St.3d 73, 79. Thus, our analysis simultaneously addresses Sinkfield's rights under both constitutions.
"The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig (1990),497 U.S. 836, 845. Although this rationale is similar to that forming the foundation for the evidentiary rules prohibiting introduction of hearsay, the two are not coextensive. State v.Dever (1992), 64 Ohio St.3d 401, 415, citing California v. Green
(1970), 399 U.S. 149, 155-56, and Dutton v. Evans (1970),400 U.S. 74, 86. Consequently, the Confrontation Clause bars the admission of some evidence that is otherwise admissible under a hearsay exception. Dever, supra.
At the same time, not all erroneously admitted hearsay evidence is violative of the Confrontation Clause. Green, supra
at 155-56. The Ohio Supreme Court has recently summarized the circumstances under which an accused may be denied his usual right to force a declarant to submit to cross examination as follows:
 The state may deny the accused the right to cross-examination without violating the Confrontation Clause if the court deems the proffered out-of-court statements to be "so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability." White v. Illinois (1992), 502 U.S. 346, 357. That is, the right to confrontation is not absolute and "does not necessarily prohibit the admission of hearsay statements against a criminal defendant." Idaho v. Wright (1990), 497 U.S. 805, 813. Hearsay statements are deemed sufficiently reliable to allow their admission without the benefit of cross-examination when the statements (1) fall within a firmly rooted hearsay exception," or (2) contain "`adequate indicia of reliability.'" Ohio v. Roberts (1980), 448 U.S. 56, 66. Therefore, to be admissible, * * * [the declarant's] statements must meet one of the prongs of Roberts. (Parallel cites omitted.)
State v. Madrigal (2000), 87 Ohio St.3d 378, 385.
In the present case, the State does not contend that Stevens' statements fell within a firmly rooted hearsay exception, and we note that any such argument would be futile. See Lilly v.Virginia (1999), 527 U.S. 116, 119 S.Ct. 1887; Madrigal, supra at 385-86. Rather, the State contends that the statements are "supported by guarantees of trustworthiness." such as Brown's and Byrdsong's denials that Henry Watson was present when Vance was murdered and Watson's own testimony denying his involvement in the crimes. Appellee's Brief at 11. That other evidence corroborates Stevens' statements is, however, irrelevant. Madrigal, supra at 387, citing Lilly, supra at 137-38, 119 S.Ct. 1887, 1900-01. "The relevant circumstances include `only those that surround the making of the statement and that render the declarant particularly worthy of belief.'" Madrigal, supra, quoting Idaho v. Wright,497 U.S. at 819.
The State also notes, however, that Stevens had nothing to gain by making the statements to Detective Burke inasmuch as he had already been tried and convicted of the robberies and murder, and his convictions had been upheld by this court on appeal. In addition, Stevens did not attempt to shift blame for the crimes by making the statements testified to by Detective Burke. Instead, Stevens merely (1) denied that he had confessed his involvement in Vance's murder to Garrett (which we note is not the same as a denial of involvement in the crime), and (2) denied he had implicated Henry Watson in the murder. We also observe that there is no suggestion in the record that Stevens' statements were made in exchange for favorable treatment of any kind by law enforcement or corrections personnel.
It is questionable whether Stevens' statements inculpated Sinkfield at all, and if so, to what degree. Regardless, we find Stevens' statements are imbued with sufficient indicia of reliability to withstand Sinkfield's constitutional challenge. The Supreme Court's observations in Dutton v. Evans (1970),400 U.S. 74, 87, are equally true in the present case, and were stated as follows:
 This case does not involve evidence in any sense "crucial" or "devastating." * * * It does not involve the use, or misuse, of a confession made in the coercive atmosphere of official interrogation * * *. It does not involve any suggestion of prosecutorial misconduct or even negligence * * *. It does not involve the use by the prosecution of a paper transcript * * *. It does not involve a joint trial * * *. And it certainly does not involve the wholesale denial of cross-examination. * * *.
Therefore, we conclude that the admission of Detective Burke's testimony relating to Stevens' statements did not violate Sinkfield's right to confront the witnesses against him as provided in the Ohio and United States Constitutions. Sinkfield's fourth assignment of error is overruled.
Having sustained Sinkfield's second assignment of error, overruled his third and fourth assignments, and found the remainder moot, the judgment of the trial court is reversed, and this cause is remanded for a new trial.
WOLFF, J. and FAIN, J., concur.
[1] Under Evid.R. 804(B)(3), Stevens' confession to the murder was probably admissible as a statement against interest. That portion of his statement inculpating Henry Watson, however, was not against Stevens' own penal interest, and was therefore not admissible under that exception to the hearsay rule. Moreover, its admissibility under any other exception to the hearsay rule is questionable. The State failed to object to that part of Garrett's testimony, however, and we consequently ponder its admissibility no more.
[2] Section 10, Article I of the Ohio Constitution provides that, except in certain cases not relevant here, "[i]n any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face * * *."
[3] Under the Sixth Amendment to the United States Constitution, in all criminal prosecutions, the accused has a right "to be confronted with the witnesses against him." SeePointer v. Texas (1965), 380 U.S. 400 (applying theSixth Amendment to the states via the Fourteenth Amendment).